# EXHIBIT A-2

FILED
2/20/2020 8:38 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Christi Underwood DEPUTY

1 CIT-ESERVE

2 CITS SOS-ESERVE

DC-20-02803

CAUSE NO. _____

| EMILY RUTH CANNON and CHRISTOPHER CANNON, | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | DALLAS COUNTY, TEXAS |
| AMAZON.COM, INC., KSSM, LLC d/b/a BABY FOOT USA, and FINN RICH ENTERPRISES, LLC d/b/a MAVERICK TRADING CO., | § | |
| | § | |
| Defendants. | § | M-298 ____ JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME Plaintiffs Emily Ruth Cannon and Christopher Cannon, complaining of Defendants Amazon.com, Inc., KSSM, LLC, d/b/a Baby Foot USA, and Finn Rich Enterprises, LLC d/b/a Maverick Trading Co. (collectively, "Defendants"), and for causes of action, would respectfully show the Court as follows:

### I.    DISCOVERY CONTROL PLAN

1.    Plaintiffs intend to conduct discovery under Level 3 of Tex. R. Civ. P. 190.4 and affirmatively plead that this suit is not governed by the expedited-actions process in Tex. R. Civ. P. 169.

### II.    RELIEF

2.    Pursuant to Tex. R. Civ. P. 47(c)(5), Plaintiffs seek monetary relief of over $1,000,000. The damages sought are within the jurisdictional limits of this court.

### III.    PARTIES

3.    Plaintiffs Emily Ruth Cannon ("Mrs. Cannon" or "Emily Ruth Cannon") and

Christopher Cannon ("Mr. Cannon" or "Christopher Cannon") (together as "Plaintiffs") are individuals residing in Dallas County, Texas.

4.  Defendant Amazon.com, Inc. ("Amazon" and "Amazon.com"), is a Delaware corporation with its principal place of business in Seattle, Washington. Service may be had upon Amazon by serving its registered agent, Corporation Service Company d/b/a CSC-lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas, 78701-3218.

5.  Defendant KSSM, LLC d/b/a Baby Foot USA ("Baby Foot") is a Missouri limited liability company with its principal place of business located at 1655 S. Enterprise Ave, Suite B, Springfield, Missouri 65804. Baby Foot may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas, 78701, as Baby Foot's agent for service because Baby Foot has engaged in business in Texas but has not designated or maintained a resident agent for service of process in Texas.

6.  Defendant Finn Rich Enterprises, LLC d/b/a Maverick Trading Co. ("Maverick") is a Massachusetts limited liability company with its principal place of business in Rockland, Massachusetts. Maverick may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas, 78701, as Maverick's agent for service because Maverick has engaged in business in Texas but has not designated or maintained a resident agent for service of process in Texas.

## IV.    JURISDICTION AND VENUE

7.  This Court has jurisdiction because the amount in controversy exceeds the minimum jurisdictional limits of this Court.

8.  This Court has personal jurisdiction over each of the Defendants because each of the Defendants has conducted and does conduct business in the State of Texas. Each of the Defendants has purposefully and voluntarily placed the Baby Foot Product into the stream of

commerce with the expectation that it would be purchased by consumers in Texas. And, specifically, each of the Defendants offered for sale, advertised, distributed and/or sold to Plaintiffs, in Texas, the Baby Foot Product at issue through Amazon.com, and it is in Texas that Plaintiff, Emily Ruth Cannon, was injured by her proper and foreseeable use of the Baby Foot Product that she purchased from Defendants. This Court also has personal jurisdiction over Defendants, none of whom reside in Texas, pursuant to the Texas long-arm statute because these Defendants have committed torts in whole or in part in the State of Texas. TEX. CIV. PRAC. & REM. CODE § 17.042(2).

9.      Pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1), venue is proper in Dallas County, Texas, because it is the county in which all or a substantial part of the events giving rise to Plaintiffs' claims occurred.

## V.    FACTS

10.     According to Baby Foot's website, the original Baby Foot Product was created in Tokyo, Japan, as an at-home treatment to relieve various problems on the feet, including dryness, cracked soles, and accumulated dead skin layers. In 2012, after selling more than 1 million Baby Foot peels worldwide, the Baby Foot Product launched for sale in the United States. Baby Foot is the manufacturer and distributor of the Baby Foot Product in the United States.

11.     On its website, Baby Foot claims that the Baby Foot Product is designed to remove the unsightly, dead skin cells on feet that build up over time and contribute to numerous problems associated with the soles of the feet. Baby Foot also maintains that the fruit acids in the Baby Foot Product penetrate the layers of dead skin cells and break down the desmosomes that hold the layers together. According to Baby Foot, this process leaves the skin "undamaged," giving its users "healthy, beautiful feet."

12.     Consumers, such as Emily Ruth Cannon, use the Baby Foot Product by placing

clear, plastic booties, which are pre-filled with a gel-like substance, over their feet, and leaving their feet in the pre-treated booties for an hour. Consumers are then to remove their feet from the booties and wash their feet gently with soap and water. The peeling process, according to Baby Foot, which removes layers of dead skin on the feet, will start between 5 and 7 days after treatment.

13.    In mid-August, 2018, in Dallas, Texas, Emily Ruth Cannon purchased the Baby Foot Product online from Amazon.com. Mrs. Cannon had purchased the Baby Foot Product at least three times in the past, and she had used the Baby Foot Product as directed, without incident, on those prior occasions.

14.    On August 20, 2018, Mrs. Cannon followed the instructions for the Baby Foot Product, and she used it, as directed by the Baby Foot Product's package directions, just as she had previously. After leaving her feet in the booties for one hour, as directed by the instructions, Mrs. Cannon began to wash her feet with mild soap and water. Immediately after washing her feet, however, Mrs. Cannon noticed that her feet were incredibly painful when she exposed them to the air. The pain was so intense that when she was showering later that same day, she almost fainted. Her feet began to appear red and burned. By the next day, the pain in Mrs. Cannon's feet was much worse, as were the burns, and a very large blister had formed on the big toe of her right foot.

15.    Although Mrs. Cannon expected that the pain and injuries would heal within a couple of days, the pain only worsened, and the wounds on both of Mrs. Cannon's feet began to scab. The pain was getting more intense, so much so that walking became impossible for Mrs. Cannon. Mrs. Cannon's husband, Christopher Cannon, was forced to miss work for several days because Mrs. Cannon was unable to care for herself or their three children due to the injuries and tremendous pain in her feet.

16.    Within just days of using the Baby Foot Product, on August 26, 2018, because her pain continued to increase, Mrs. Cannon went to the Highland Park Emergency Room for

treatment. The emergency room doctor administered antibiotics and discharged Mrs. Cannon. Just a few days later, however, on August 29, 2018, Mrs. Cannon's feet looked even worse, and the pain was even more intense, so Mrs. Cannon returned to the Highland Park ER. The doctor was concerned that there was a fluid-filled blister underneath her big toe, so he attempted to drill through her toenail to relieve the pressure. She was given morphine, Zofran, and several kinds of antibiotics at the ER. But the ER doctor was concerned that Mrs. Cannon's skin was necrotizing, so he transferred Mrs. Cannon to Methodist Hospital, in Dallas, Texas, via ambulance.

17.    Once she arrived at Methodist Hospital, Mrs. Cannon was given more antibiotics and even more pain medication. Methodist Hospital provided Mrs. Cannon with information about first, second, and third degree chemical burns, and the doctors there instructed Mrs. Cannon to see a podiatrist immediately.

18.    Following the instructions of the Methodist physicians, Mrs. Cannon saw a podiatrist the following day, on August 30, 2018. The podiatrist cleaned the wound and showed Mrs. Cannon how to dress it. To clean the injury, the podiatrist injected a numbing agent directly into Mrs. Cannon's toe several times. The podiatrist also sent Mrs. Cannon for an MRI, and after he reviewed it, he prescribed Mobic, which is a non-steroidal anti-inflammatory drug. Although the toe appeared to be slowly healing over the course of the next few weeks, Mrs. Cannon was still in immense pain. She could not drive, and she was unable to take care of her children or work as a realtor.

19.    Because her pain was not dissipating, Mrs. Cannon consulted a double board-certified surgeon specializing in interventional pain management. The surgeon prescribed Mrs. Cannon pain medication and assumed, albeit incorrectly, that when Mrs. Cannon's foot healed, her pain would be alleviated. During this same time, Mrs. Cannon also saw a foot surgeon to evaluate her foot and her injuries, and he gave Mrs. Cannon a boot to wear to keep pressure off of

her toe. Mrs. Cannon also continued to see her podiatrist who advised Mrs. Cannon that she was facing an extreme risk of amputation because her foot had been so gravely injured.

20.     In late September of 2018, a little over a month after the injury, Mrs. Cannon's foot appeared to be visually healing, but her pain continued to get much worse. Mrs. Cannon still could not drive or work, nor could she walk, making caring for her small children virtually impossible. Mrs. Cannon was using a knee scooter to get around her house. Mrs. Cannon, who was a successful real estate agent, was unable to work because she was unable to leave her home without assistance, and walking was impossible. Mrs. Cannon also had incredible difficulty sleeping at night because of the pain, and she required Ambien in order sleep. During this time, Mrs. Cannon's family and friends were having to drive her to multiple doctors' appointments and procedures, and she was given a handicapped parking pass because she was unable to walk. Ms. Cannon's entire foot was incredibly swollen from the injuries, and her pain was unbearable.

21.     In October of 2018, the pain, which had only gotten worse with time, began moving up Mrs. Cannon's leg. Not only did her toe hurt, but her entire foot and leg were also in terrible pain. Around this same time, Mrs. Cannon experienced spontaneous paralysis of her leg and literally had to drag it behind her.

22.     In light of her worsening condition, Mrs. Cannon went back to the surgical pain specialist, and he told Mrs. Cannon that he suspected she suffered from Complex Regional Pain Syndrome ("CRPS"), and he suggested that Mrs. Cannon get a nerve block. CRPS is a is a chronic pain condition that most often affects one limb (arm, leg, hand, or foot), usually after an injury. CRPS is believed to be caused by damage to, or malfunction of, the peripheral and central nervous systems.

23.     On her doctor's instructions, on October 18, 2018, Mrs. Cannon went to Park Cities Surgery Center to have a nerve block placed, which is a procedure by which numbing medication

is injected directly into the spine. Mrs. Cannon had to be sedated for the procedure. Afterward, she was in so much pain that she was unable to sleep. But, because of the nerve block, the pain lessened over the next week, and Mrs. Cannon finally felt some relief.

24.    Unfortunately, by the beginning of the following week, Mrs. Cannon's pain returned with greater intensity than ever before. Mrs. Cannon returned to the pain specialist, and he officially diagnosed Mrs. Cannon with Complex Regional Pain Syndrome.

25.    Mrs. Cannon was still unable to drive or to work, and she and her husband were required to hire a babysitter to pick their children up from school and care for the children when Mrs. Cannon's husband was traveling for work. The Cannons also leaned on their family and friends to help them during this time.

26.    Also, during this time, Mrs. Cannon saw a board-certified vascular and thoracic surgeon, as recommended by her general doctor, and he referred Mrs. Cannon to a neurosurgeon at Methodist Hospital for a second opinion on the diagnosis of CRPS. The neurosurgeon confirmed the diagnosis and said that he felt that Mrs. Cannon was in good hands with her surgical pain specialist.

27.    Given Mrs. Cannon's continuing and worsening pain, the surgical pain specialist suggested the insertion of a spinal cord stimulator. Specifically, he suggested inserting electrical wires into Mrs. Cannon's affected vertebra, an extensive and risky procedure that would hopefully alleviate Mrs. Cannon's neurological pain.

28.    The insertion of the spinal cord stimulator is a multi-step surgical process. First, a temporary device is surgically inserted into the patient's spine to confirm that the procedure will actually relieve the patient's pain. Second, if the patient's pain is relieved, the temporary device is removed, and the patient is required to wait for at least two weeks before undergoing a second surgical procedure during which the permanent device is inserted into the patient's spine.

29.    On December 13, 2018, the surgeon performed the initial procedure. Unfortunately, this initial, temporary procedure was incredibly painful for Mrs. Cannon. The surgeon had great difficulty accessing the vertebra that directly affected Mrs. Cannon's foot. Mrs. Cannon has two bony vertebrae that overlap, which made it extremely difficult for the surgeon to access the L4 nerve root.

30.    The surgeon attempted a few times, scraping the bones, but he was not able to access the L4 vertebrae. Regardless, after a few days with the temporary device, Mrs. Cannon noticed a dramatic difference in the pain in her leg. Mrs. Cannon had to wear an external battery pack, which was tied to wires in her spine. She also carried an iPod that she could use to adjust the nerve pulses and reduce her pain. After she healed from the surgery, she noticed that the pain in her leg was significantly relieved, but Mrs. Cannon continued to experience pain on the top of her foot and on her toes. Nonetheless, the results of the temporary procedure were still so beneficial that Mrs. Cannon made an appointment to see her surgical pain specialist, and she requested to move forward with a permanent placement. When the temporary leads were removed, Mrs. Cannon's pain returned within an hour.

31.    The insurance approval process for the permanent procedure was difficult, and Mrs. Cannon had to wait during the holidays for this process to be completed. Mrs. Cannon was increasingly depressed because the pain kept her from being able to enjoy the holidays with her family. During her children's holiday break, Mr. and Mrs. Cannon had to hire babysitters to care for their children because Mrs. Cannon was still unable to drive and be active. Mrs. Cannon also remained unable to work.

32.    Finally, in January of 2019, the procedure for the spinal cord stimulator was scheduled. On January 10, 2019, Mrs. Cannon underwent the procedure. Thankfully, this time, the surgeon was able to get wires placed in both nerve sections, and a permanent battery pack was

placed on Mrs. Cannon's left hip. It took Mrs. Cannon about a week to heal from the surgery, but the relief of pain started quickly. Mrs. Cannon was relieved and overwhelmed by the difference in her pain levels. Mrs. Cannon also began physical therapy.

33. Mrs. Cannon found physical therapy incredibly humbling. Even the tiniest movement of her toes and feet was very painful. There was a pronounced delay between Mrs. Cannon's telling her foot to do something and her body's following through. The physical therapist prescribed exercises for Mrs. Cannon, which Mrs. Cannon did every day at home. After her first visit to physical therapy, Mrs. Cannon had a flare up; her foot turned purple and swelled significantly. Her surgeon explained to Mrs. Cannon that the pain was to be expected, and that in order to recover, she would have to be vigilant with physical therapy. Mrs. Cannon went to physical therapy twice a week for 6 weeks, and she also performed her exercises every day at home.

34. Thanks to the procedure, and a tremendous amount of physical therapy, Mrs. Cannon was able to gradually begin driving again in the spring of 2019. Mrs. Cannon still uses the iPod to adjust the signal strength if she experiences bad days, or she takes medication. She continues physical therapy at home. Mrs. Cannon has also been easing back into work.

35. Currently, Mrs. Cannon's toe is peeling again, and it becomes very red and swollen if she is on her feet for a prolonged period of time, which happens often when she works as a realtor. She takes Epsom salt baths, massages her foot and toe, and she rests when necessary. She is also dramatically more fatigued than before her injury. Mrs. Cannon continues to recover, but she looks back on her time post-injury as the most challenging time in her life. She is saddened by the amount of time that she spent alone and by how much she missed with her children at such pivotal ages. Mrs. Cannon also missed a great deal of time with her friends and her husband. And, she was forced to decline several real estate clients because she was unable to work while she was

injured. Mrs. Cannon's husband also missed an incredible amount of work, for which he was not paid, and the couple was very concerned that Mr. Cannon might lose his job.

36.     Mrs. Cannon's foot is permanently disfigured as a result of the injury. Mrs. Cannon will never be able to wear heels again because they are far too painful. In addition, the spinal cord procedure that alleviated her pain will have to be repeated in ten years. At that time, the device will have to be removed for a period of time, and a new device will have to be inserted. In addition, because of the physical and emotional toll that the injury took on Mrs. Cannon, her relationship with Mr. Cannon was dramatically strained during this time. Plainly, the emotional and financial toll that this injury has taken on Mrs. Cannon and her family is indescribable, so much so that the effects are still felt by Plaintiffs today and will be felt well into the future.

## VI.    CAUSES OF ACTION

### COUNT ONE: STRICT PRODUCTS LIABILITY – MANUFACTURING AND MARKETING DEFECTS (FAILURE TO WARN)

37.     Plaintiffs incorporate by reference herein the preceding paragraphs.

38.     Defendant Baby Foot was, at the time of this occurrence, and is now, engaged in the business of manufacturing, packaging, and distributing the Baby Foot Product for sale to and for use by members of the general public, including Plaintiffs. Defendant Baby Foot placed the Baby Foot Product into the stream of commerce by selling and distributing the Baby Foot Product for sale on Amazon.com.

39.     Defendants Amazon and Maverick were, at the time of this occurrence, and are now, engaged in the business of distributing and selling products, including the Baby Foot Product at issue, to members of the general public, including Plaintiffs.

40.     In August of 2018, Mrs. Cannon purchased the Baby Foot Product from Amazon.com. The Baby Foot Product was in the same condition at the time that Mrs. Cannon was

injured as it was when originally manufactured and at the time that Mrs. Cannon purchased the Baby Foot Product online from Amazon.com.

41.    Mrs. Cannon was injured by using the Baby Foot Product according to the instructions that came with the Baby Foot Product, and in a manner that was intended and foreseen by Defendants. The Baby Foot Product is applied to consumer's feet via the plastic booties that are pre-filled with the chemical agents, and which are intended to remain on the consumer's feet for one hour. After the expiration of the one-hour period, the consumer is to remove the booties and wash her feet with mild soap and water. On August 20, 2018, Mrs. Cannon followed the package instructions, and she used the Baby Foot Product in exactly this manner. Unfortunately, as is more fully detailed above, despite her proper use of the Baby Foot Product, Mrs. Cannon was gravely injured by the Baby Foot Product, and she and Mr. Cannon suffered damages as a result.

42.    The Baby Foot Product was defective and unsafe for its intended purpose at the time that it left the control of Baby Foot, and at the time that it was sold by Amazon and Maverick.

43.    Specifically, the Baby Foot Product suffered from a manufacturing defect in that it failed to conform to the product's specifications in that the chemical compounds contained in the Baby Foot Product were so toxic that they caused severe chemical burns and deep neurological damage to Mrs. Cannon's feet despite her proper use of the Baby Foot Product.

44.    Further, the Baby Foot Product suffered from a marketing defect because there was no warning that using the product as directed could potentially result in severe chemical burns and neurological damage to the feet.

45.    These defects were a producing cause of Plaintiffs' injuries and damages.

46.    Further, Amazon and Maverick as sellers and distributors of the Baby Foot Product are subject to liability pursuant to TEX. CIV. PRAC. & REM. CODE §82.003(a)(5) because Amazon and Maverick made express factual representations about the Baby Foot Product, the

representations were incorrect, Plaintiff relied on the representations in using the Baby Foot Product, and if the aspect of the Baby Foot Product had been as represented, Plaintiffs would not have been harmed by the Baby Foot Product. Specifically, Amazon and Maverick represented that the Baby Foot Product would restore feet to a soft, smooth feel, that use of the Baby Foot Product was safe, and that there would be no pain at all associated with the use of the Baby Foot Product. These representations were incorrect.

## COUNT TWO: BREACH OF IMPLIED WARRANTY

47.     Plaintiffs incorporate by reference herein the preceding paragraphs.

48.     In addition, Defendants impliedly warranted to the public, generally, and to Plaintiff Emily Ruth Cannon, specifically, that the Baby Foot Product was safe and fit for the purpose intended when used under ordinary circumstances and in an ordinary manner. Defendants knew or had reason to know of the purposes for which Plaintiff, Emily Ruth Cannon, purchased the goods, Plaintiff was relying on the Defendants' skill and judgment to select and furnish suitable goods, and the goods in question were unfit for the purpose for which they were intended to be used in one or more of the following particulars: the chemical compounds contained in the Baby Foot Product were so toxic that they caused severe chemical burns and deep neurological damage to Mrs. Cannon's feet despite her proper use of the Baby Foot Product.

49.     Plaintiffs suffered injuries and damages as a result of Defendants' breach of warranty.

## COUNT THREE: NEGLIGENCE

50.     Plaintiffs incorporate by reference herein the preceding paragraphs.

51.     Defendants were negligent in manufacturing and marketing the Baby Foot Product.

52.     Defendants had a duty to Plaintiffs to manufacture and market the Baby Foot Product so that it was safe for its intended users. Specifically, Defendants breached their duty to

Plaintiffs in the following ways:

    a.  Defendant Baby Foot was negligent in failing to manufacture the Baby Foot Product in conformance with the product specifications in that the chemical compounds contained in the Baby Foot Product used by Plaintiff, Emily Ruth Cannon, were so toxic that they caused severe chemical burns and deep neurological damage to Mrs. Cannon's feet despite her proper use of the Baby Foot Product; and

    b.  Defendants Baby Foot, Maverick, and Amazon were negligent in failing to warn Plaintiff, Emily Ruth Cannon, that using the Baby Foot Product as directed could potentially result in devastating injuries in the form of severe chemical burns and neurological damage.

53.    Defendants' acts or omissions, taken by themselves or in combination, were a proximate cause of Plaintiffs' injuries and damages for which Defendants are liable and for which Plaintiffs seek damages.

54.    **RES IPSA LOQUITUR:** Plaintiffs cannot allege more specifically the acts of negligent manufacture of Defendant Baby Foot because facts within that regard are peculiarly within Defendant Baby Foot's knowledge. In the alternative, in the event that Plaintiffs are unable to prove specific acts of negligent manufacture, Plaintiffs rely on the doctrine of res ipsa loquitur. In this regard, Plaintiffs will show that the character or occurrence giving rise to this litigation is such that it would not have happened in the absence of negligence, and that the manufacturing of the Baby Foot Product was within the exclusive control of Defendant Baby Foot at the time that the negligence occurred. Plaintiffs had no means of ascertaining the method or manner in which the product was manufactured, and it came into Plaintiffs' possession in the same condition it was in when it left the control of Defendant Baby Foot. Thus, Defendant Baby Foot was negligent in

the manufacture of the Baby Foot Product, which negligence was a proximate cause of the injuries and damages sustained by Plaintiffs.

## COUNT FOUR: PLAINTIFF CHRISTOPHER CANNON'S LOSS OF SPOUSAL CONSORTIUM AND LOSS OF SERVICES

55.    Plaintiffs incorporate by reference herein the preceding paragraphs.

56.    As a result of the injuries sustained by Plaintiff Emily Ruth Cannon, her ability to administer to the needs of her family and to attend to her customary household duties and occupations has been seriously impaired, and in all reasonable probability it will continue to be seriously impaired far into the future. Plaintiff Christopher Cannon is entitled to damages for this loss of familial services.

57.    In addition, Plaintiff Christopher Cannon would further show that he was married to Plaintiff Emily Ruth Cannon on the date of the occurrence made the basis of this civil action and had been so married for the past thirteen years. As a direct and proximate result of Defendants' strict liability and negligence, as described above, there has been a substantial impairment of the marital relationship between Plaintiffs. Accordingly, Plaintiff Christopher Cannon has sustained a serious loss of the affection, solace, comfort, companionship, society, assistance, and sexual relationship that he previously received from his spouse, and Plaintiff Christopher Cannon is entitled to damages for this, his loss of spousal consortium.

## VII.    CONDITIONS PRECEDENT

58.    All conditions precedent for the claim above have been performed or have occurred.

## VIII.    JURY DEMAND

59.    Plaintiffs hereby demand a trial by jury.

PLAINTIFFS' ORIGINAL PETITION                                                                PAGE 14

## IX.   PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs Emily Ruth Cannon and Christopher Cannon pray for judgment against Defendants Amazon.com, Inc., KSSM, LLC d/b/a Baby Foot USA, and Finn Rich Enterprises, LLC d/b/a Maverick Trading Co., for the injuries and damages that Plaintiffs incurred as a result of the personal injuries that Plaintiff Emily Ruth Cannon suffered from the use of the Baby Foot Product:

A.   Plaintiff Emily Ruth Cannon's past and future medical expenses;

B.   Plaintiff Emily Ruth Cannon's past and future pain and suffering;

C.   Plaintiff Emily Ruth Cannon's past and future mental anguish;

D.   Plaintiff Emily Ruth Cannon's past and future loss of earning capacity;

E.   Plaintiff Emily Ruth Cannon's past and future disfigurement;

F.   Plaintiff Emily Ruth Cannon's past and future physical impairment;

G.   Plaintiff Christopher Cannon's loss of services;

H.   Plaintiff Christopher Cannon's loss of spousal consortium.

I.   An award to Plaintiffs of their costs and pre- and post-judgment interest as provided by law; and

J.   Orders granting such other and further relief as the Court deems necessary, just, and proper.

Respectfully submitted,


/s/ Elizabeth M. Cunningham
**Jon-Bernard Schwartz**
State Bar No. 90001829
jon@jbschwartzlaw.com
**Elizabeth M. Cunningham**
State Bar No. 24008069
liz@jbschwartzlaw.com
**JB SCHWARTZ PLLC**
Two Turtle Creek
3838 Oak Lawn Avenue
Suite 1000
Dallas, Texas 75219
Ph:    214.380.0751
Fax:    214.306.5174
**ATTORNEYS FOR PLAINTIFFS**
**EMILY RUTH CANNON AND**
**CHRISTOPHER CANNON**